UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
DEBRA GELLER and GREGG GELLER,

                    Plaintiffs,

                                              MEMORANDUM & ORDER
        -against-                             10-CV-0170(JS)(WDW)

NORTH SHORE LONG ISLAND JEWISH HEALTH
SYSTEM and ANTHONY DiFILIPPI,

                    Defendants.
---------------------------------------X
APPEARANCES
For Plaintiffs:     Alan G. Serrins, Esq.
                    Ann B. Macadangdang, Esq.
                    Serrins & Associates, LLC
                    233 Broadway, 18th Floor
                    New York, NY 10279

For Defendants:     Traycee Ellen Klein, Esq.
                    Erin M. Carney, Esq.
                    Epstein Becker & Green, P.C.
                    250 Park Avenue
                    New York, NY 10177

SEYBERT, District Judge:

        Plaintiffs Greg and Debra Geller ("Plaintiffs" or "Mr.

and Mrs. Geller") commenced this action against Mrs. Geller's

former employer, North Shore Long Island Jewish Health System

("North Shore"), and Anthony DiFilippi (together, "Defendants"),

asserting claims for hostile work environment and retaliation

under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e et seq., and the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 296 et seq., as well as several claims

under New York common law.  Presently before the Court is

Defendants' motion for summary judgment.  For the following

reasons, Defendants' motion is GRANTED.

BACKGROUND[1]

I.   North Shore's Policies and Procedures

At all times relevant hereto, North Shore maintained

written policies and procedures prohibiting discrimination in the

workplace, including directives on how to report experienced or

witnessed discrimination, including sexual harassment.  (Defs.

56.1 Stmt. ¶¶ 3, 4.)[2]  At the commencement of Mrs. Geller's

employment with North Shore, she received a copy of its Employee

Handbook, which included these non-discrimination policies and

North Shore's complaint procedure.  (Defs. 56.1 Stmt. ¶ 7.)  She

received additional copies of this handbook in February 2004, in

January 2006 (at which time she certified that she had read and

fully understood the harassment policy), and at some point in 2008.

(Defs. 56.1 Stmt. ¶¶ 8-10.)

---

[1] The following facts are drawn from the parties Local Civil Rule
56.1 Statements ("Defs. 56.1 Stmt." and "Pls. 56.1
Counterstmt.") and the documents attached thereto.  Any factual
disputes are noted.

[2] Mrs. Geller does not dispute that these policies were in place
(Mrs. Geller Dep. 138); rather, she disputes whether these
policies and procedures were adequate to prevent discrimination
and harassment from occurring.  (Pls. 56.1 Counterstmt. ¶ 3.)

II.  Work Environment at North Shore

Mrs. Geller was hired by North Shore in 2002 to work as a business analyst.  (Defs. 56.1 Stmt. ¶ 1.)  Within a few years, she was assigned to the Human Resources Information Technology Department ("HRIT"), where she took on additional duties as a business applications developer.  (Pls. 56.1 Counterstmt. ¶ 1.) At some point in 2004, Mrs. Geller began reporting to Defendant DiFilippi, who was, at all relevant times, the Director of the HRIT Department.  (Defs. 56.1 Stmt. ¶ 26.)

A.  Mrs. Geller's Schedule

In August 2004, Mrs. Geller and another employee, Leanne Sierra, submitted a proposal to job share, pursuant to which each would work five workdays every two weeks.  (Defs. 56.1 Stmt. ¶¶ 27, 29.)  North Shore approved the job share arrangement, and Mrs. Geller began working part-time that same month.  (Defs. 56.1 Stmt. ¶ 28.)

From 2002 through 2008, the majority of Mrs. Geller's responsibilities were related to "Project Einstein"--a project that involved migrating North Shore's human resource computer systems to a new computer software, PeopleSoft.  (Defs. 56.1 Stmt. ¶¶ 2, 35.)  That project concluded in 2008, and Mrs. Geller was thereafter assigned to "Project Taleo"--a project that involved implementing a new recruiting software.  (Defs. 56.1 Stmt. ¶ 36.) The Taleo Project increased Mrs. Geller's workload, and she was

required to work three days per week (as opposed to five days every two weeks) to keep up. (Defs. 56.1 Stmt. ¶ 37.)

During the summer of 2008, Ms. Sierra requested to return to a full-time schedule, which North Shore granted. (Defs. 56.1 Stmt. ¶¶ 31-32.) Although Ms. Sierra returned to a full-time schedule, Mrs. Geller continued her somewhat increased part-time schedule. (Defs. 56.1 Stmt. ¶ 33; Pls. 56.1 Stmt. ¶ 33.) Mrs. Geller's hours increased again in May 2009, and by July 2009, although she was still technically part-time, she was essentially working a full-time schedule. (Defs. 56.1 Stmt. ¶¶ 39-40.) On July 20, 2009, Plaintiff was informed by Susan Bardolf, the Senior Director of North Shore's HR Technology and Operations, and DiFilippi that her position needed to go full-time. (Defs. 56.1 Stmt. ¶ 45; Mrs. Geller Dep. 186.) Defendants assert that this decision was based on the business demands of the HRIT Department --they were anticipating a large upcoming project (Defs. 56.1 Stmt. ¶¶ 42, 45, 50-51); Plaintiffs dispute this (Pls. 56.1 Stmt. ¶ 45). Mrs. Geller ultimately accepted the full-time position.

B.    Alleged Sexual Harassment

According to Mrs. Geller, she was subject to the following actions by DiFilippi over a period of several years,

4

which she believes constitute a hostile work environment:[3]

(1)  approximately ten to fifteen times between 2004 and 2008, DiFilippi smelled Mrs. Geller's perfume while she sat at her desk (Mrs. Geller Dep. 196, 199-200, 213-14);

(2)  beginning in 2006, DiFilippi made several comments about her breasts, including (a) asking on one occasion, "Your breasts look bigger today, are you pregnant?" (Mrs. Geller Dep. 214-16, 222); (b) on more than three occasions between January 2009 and Spring of that same year, asking "Are you feeling cold?" (which Mrs. Geller perceived to be a comment related to her breasts) (Mrs. Geller Dep. 223); and (c) on more than one occasion, telling her that her "breasts look[ed] good today" (Mrs. Geller Dep. 227-29, 231-32);

(3)  on one occasion between January 2009 and July 2009, DiFilippi told her that he could kind of see through her shirt but could not make out the color of the bra she was wearing (Mrs. Geller Dep. 225);

(4)  between 2004 and 2006, DiFilippi made "multiple" comments in the workplace about a male employee smelling a female employee's recently vacated seat (Mrs. Geller Dep. 232-38);

(5)  one time DiFilippi drew a picture of a penis on his whiteboard as part of a joke (Mrs. Geller Dep. 239);

(6)  DiFilippi showed Mrs. Geller a news article concerning a New Jersey teacher accused of having sex with a minor, and she perceived the teacher to be scantily-clad in the photograph accompanying the newspaper article (Mrs. Geller Dep. 315-17);

(7)  in 2004, DiFilippi showed Mrs. Geller a picture of a co-worker riding a jet ski topless, which was a picture that was also being shown to others by the co-worker herself (Mrs. Geller Dep. 318-19, 321);

(8)  in 2005 or 2006, DiFilippi said to Mrs. Geller, "Ooh, you look good," when she showed up to dinner on a

_____

[3] Plaintiff was specifically asked at her deposition to identify the conduct that she believed contributed to her hostile work environment.  (See, e.g., Mrs. Geller Dep. 198, 232.)

business trip wearing a tank top and jeans (Mrs. Geller Dep. 322-23);

(9)  one time in 2005 or 2006, when Mrs. Geller was wearing a pair of jeans with a rip in the knee, DiFilippi touched her knee (Mrs. Geller Dep. 324); and

(10) on approximately three to eight occasions between 2006 and early 2009, when there was no seat available for Mrs. Geller at a meeting, DiFilippi indicated to her that she could sit on his lap, which Mrs. Geller believes could have been a joke (Mrs. Geller Dep. 355-57, 362-63).

In addition, DiFilippi admitted that he forwarded jokes of a sexual nature to Mrs. Geller's email (although these emails were reciprocal between Mrs. Geller and DiFilippi). (DiFilippi Dep. 97-98.) Further, Mrs. Geller testified that in 2005 or 2006, DiFilippi used the term "MILF" in reference to her. (Mrs. Geller Dep. 212.)[4] According to Mrs. Geller, the last comment or conduct contributing to the allegedly hostile work environment occurred in the spring of 2009. (Defs. 56.1 Stmt. ¶ 24.) Interestingly, however, Mrs. Geller testified at her deposition that she had a good working relationship with DiFilippi until July 2009. (Mrs. Geller Dep. 348-49.)

Despite these instances that are alleged to have occurred over a five year period, Mrs. Geller did not report any actual or perceived sexual harassment on the part of DiFilippi in

---

[4] DiFilippi denies using this acronym and asserts that it was Mrs. Geller who used the acronym to describe herself. (DiFilippi Aff. ¶ 6.)

2004, 2005, 2006, 2007, 2008, or the first half of 2009. (Defs. 56.1 Stmt. ¶ 76.) Mrs. Geller testified that she did not report the alleged sexual harassment while it was occurring because of a generalized fear[5] of retaliation. (Defs. 56.1 Stmt. ¶ 82; Mrs. Geller Dep. 157.)

C. Mrs. Geller's Conduct

Mrs. Geller admitted at her deposition that her own conduct at work may have contributed to the sexually-charged atmosphere. (Mrs. Geller Dep. 240-73.) She testified that she sent non-work related emails, including jokes, pictures, and cartoons containing sexual and racial context, to her co-workers and supervisors, including DiFilippi. (Mrs. Geller Dep. 211, 241-80). Indeed, she responded affirmatively when asked whether it was "fair to say that [her and DiFilippi] were both sending each other things that probably were unprofessional for the workplace." (Mrs. Geller Dep. 321.) In addition, Mrs. Geller discussed non-work related items at work with DiFilippi and others, including her affair with a married man. (Mrs. Geller Dep. 51-52.)

When asked at her deposition why she participated in discussions of a sexual nature in the workplace, she responded that it was a way "to fit in with everybody else," and that it was

_____

[5] Mrs. Geller's fear was "generalized" because she had not had any personal experiences where she was treated differently after bringing something to the attention of North Shore's Human Resources Department. (Mrs. Geller Dep. 157.)

the "way the department was." (Mrs. Geller Dep. 241.) In addition, when questioned as to why she sent emails of a sexual nature to others in the office, including DiFilippi, she answered that it was appropriate "because everybody sent emails regarding sexual nature in the department." (Mrs. Geller Dep. 250.)

## III. Mrs. Geller's Complaints

On July 10, 2009, a meeting was held by DiFilippi regarding the Taleo Project. (Defs. 56.1 Stmt. ¶ 70.) DiFilippi and co-workers, Sandra Lembck and Denise Chase, attended in person, and Mrs. Geller participated over the phone. (Defs. 56.1 Stmt. ¶¶ 70, 72.) During this meeting, there was a conversation regarding Ms. Chase and Mrs. Geller missing a deadline and their improper delegation of responsibilities. (Defs. 56.1 Stmt. ¶ 71; Pls. 56.1 Stmt. ¶ 71.) DiFilippi thought Ms. Chase was unprofessional and insubordinate during this meeting, which caused him to raise his voice to her. (Defs. 56.1 Stmt. ¶ 72.) Later that day, DiFilippi sent a follow-up email to Mrs. Geller and Ms. Chase regarding what was discussed at the meeting. (Oetting Aff. Ex. A.)[6] Subsequently, Mrs. Geller sent Dahlys Oetting, the

---

[6] The email stated in its entirety as follows:

> Deb and Denise,
>
> I know you both have been working extremely hard to try to get this done, and it is appreciated. I understand there is a learning curve that you are both dealing with.

8

As I stated yesterday, the dates cannot slip. The facts are as follows:

- The deadline for config [sic] is today, which we knew last Monday.  I'm assuming you were both comfortable with the deadline because neither of you mentioned any concern to Sandra or myself.  We definitely knew it would be tight, but did not know it would be this bad

- We need (not it's clarified) 40 hours next week for the Process flow.  So next week is done.

- Deb wasn't going to work today or over the weekend

- Denise is on vacation for the next two weeks.

That being said, the facts lead me to the decision to add a resource.  As discussed yesterday on the conference call, you were supposed to split the work in thirds.  Heidi agreed that the volume was an issue, and the methods of the different aspects of the config [sic] and building forms was the same.  Complexity was not, but that should not be an issue.

I did not say you should let Heidi do everything, which appears to be the case.  You both need to have an action plan in place on how to support Taleo on boarding because it is your responsibility.

It appears that you both have already thrown in the towel and requested Heidi to complete everything that is open.  I was hoping you would follow the instructions given by Sandra and myself.  Unfortunately, if this is not the case, you both are still responsible for supporting ATS and On boarding [sic] and need

Director of Human Resources, an email requesting that they meet to discuss this email from DiFilippi. (Defs. 56.1 Stmt. ¶ 69; Oetting Aff. Ex. B.)

Ms. Oetting met with Mrs. Geller on July 13, 2009. (Defs. 56.1 Stmt. ¶ 73.) Mrs. Geller told Ms. Oetting that DiFilippi screamed during the July 10, 2009 meeting and that she was upset because it reminded her of her abusive ex-husband. (Defs. 56.1 Stmt. ¶ 73; but see Geller Dep. 305 (testifying that DiFilippi's anger had nothing to do with her gender).) Ms. Oetting invited DiFilippi to join their meeting to discuss the incident, because Mrs. Geller had expressed that she wanted him to apologize. (Oetting Dep. 57-58; Defs. 56.1 Stmt. ¶ 75.) DiFilippi, however, refused to apologize, stating that he was merely reprimanding Ms. Chase--not Mrs. Geller--for her unprofessional behavior at the meeting. (DiFilippi Dep. 58-59.) This was the first time that Mrs. Geller had complained to Ms. Oetting or anyone about DiFilippi's conduct. (Defs. 56.1 Stmt. ¶ 76.)

Shortly thereafter, Mrs. Geller contacted the Employee Assistance Program and was directed to contact North Shore's

_____

> to determine how you will do this without the experience or knowledge you state you need. So, please do whatever you need to to [sic] to get your comfort level up.
>
> Anthony

(Oetting Aff. Ex. A.)

Corporate Compliance Department instead. (Mrs. Geller Dep. 179.)
On July 23, 2009, Mrs. Geller called the Corporate Compliance
Department to report her belief that she was being retaliated
against for complaining about DiFilippi's "unethical conduct."
(Pls. Ex. 12 at D00283.)[7] She stated that, after complaining about
DiFilippi's conduct at the July 10, 2009 meeting, she was informed
that her position was being changed to full-time. (Pls. Ex. 12 at
D00283.) See also supra p. 4. Mrs. Geller testified at her
deposition about other alleged incidents of retaliation: Ms.
Lembck and Mr. DiFilippi stopped talking to her, she was asked to
document how many hours she spent on specific tasks,[8] she was taken
off the Taleo Project and given "grunt" work, she was not included
on an email that DiFilippi sent to the HRIT team advising them to
leave early for a holiday, DiFilippi sent Ms. Chase an email
congratulating her for her work on the Taleo Project and he did
not send one to Mrs. Geller, and her cubicle was relocated. (Mrs.
Geller Dep. 369-76, 384, 386, 394.)

On July 30, 2009, Mrs. Geller met with Kim Greene, a
Corporate Compliance employee, for approximately one hour. (Defs.

_____

[7] This phone call may have been anonymous. (Compare Pls. Ex. 12
at D00283 (Corporate Compliance record indicating that an
anonymous female called on July 23, 2009), with Mrs. Geller Dep.
182.)

[8] Around the same time, Mrs. Geller had complained that she was
not being paid for all hours worked. (Mrs. Geller Dep. 369-70.)

56.1 Stmt. ¶ 13; Mrs. Geller Dep. 352.)  During this meeting, Mrs. Geller mentioned for the first time that Defendant DiFilippi was engaging in sexually inappropriate behavior.  (Mrs. Geller Dep. 354-55.)  After this meeting, Mrs. Geller was never again subjected to sexually offensive conduct while working at North Shore.  (See Mrs. Geller Dep. 224 (stating that the last incident occurred in the spring of 2009).)

## IV.  North Shore's Response

As a result of Mrs. Geller's complaint, Corporate Compliance commenced an investigation into Mrs. Geller's allegations.  (Gloade Aff. ¶ 5.)  Ultimately, however, North Shore concluded that Mrs. Geller's claims of retaliation had no merit because, according to Defendants, the return of her position to full-time status was unrelated to the meeting that occurred on July 10, 2009 and, in fact, had been decided prior to that date. (Gloade Aff. ¶ 5.)[9]

## V.  Mrs. Geller's Resignation

On February 4, 2010, Mrs. Geller got into an argument with a supervisor, Ms. Lembck, which ended with Plaintiff putting her hand up in front of Ms. Lembck's face and walking out of a

---

[9] During its investigation, Corporate Compliance also determined that Mrs. Geller and her colleagues had been using North Shore's electronic information systems to send non-work related emails with unacceptable content.  (Gloade Aff. ¶ 6.)  As a result, North Shore conducted mandatory anti-harassment and anti-discrimination training.  (Gloade Aff. ¶ 6.)

meeting.  (Defs. 56.1 Stmt. ¶ 85; Mrs. Geller Dep. 311-13.)  Ms. Lembck issued Mrs. Geller a disciplinary warning notice for her conduct that day.  (Lembck Dep. 264-65.)  Mrs. Geller did not return to work and instead took a disability-related leave of absence.  (Mrs. Geller Dep. 400; Defs. 56.1 Stmt. ¶¶ 86-87.)[10]

During this time, Mrs. Geller vacationed with her family in Orlando, Florida from March 8 through March 16, 2010.  (Defs. 56.1 Stmt. ¶ 89.)  When she came back from vacation, she resigned from North Shore via letter from her attorney dated March 19, 2010, which made her resignation effective March 31, 2010.  (Defs. 56.1 Stmt. ¶¶ 90-91.)  It is undisputed that Mrs. Geller received an offer of employment from the City University of New York ("CUNY") before she resigned from North Shore.  (Defs. 56.1 Stmt. ¶ 93; Pls. 56.1 Counterstmt. ¶ 93.)  Despite Mrs. Geller's assertion to the contrary, the evidence clearly establishes that she also accepted the offer prior to her resignation from North Shore. (Mrs. Geller Dep. 90-92 & Ex. 1.)

VI.  Procedural History

On January 14, 2010, before her leave of absence and before her resignation, Plaintiffs commenced this action. Plaintiffs filed an Amended Complaint on March 19, 2010 asserting the following causes of action on behalf of Mrs. Geller: (1)

---

[10] Mrs. Geller testified that this argument resulted in her having an anxiety attack.  (Mrs. Geller Dep. 399-400.)

hostile work environment claims under Title VII and NYHRL; (2) claims for discrimination under Title VII and NYHRL; (3) intentional infliction of emotion distress; and (4) negligent infliction of emotional distress. The Amended Complaint also asserts a claim for loss of consortium on behalf of Mr. Geller.

Defendants moved for summary judgment on April 30, 2012 (Docket Entries 71-77). That motion is presently before the Court.

## DISCUSSION

The Court will first discuss the applicable standard of review before analyzing the merits of Defendants' motion.

## I.   Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials will not suffice."); Weinstock, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact.").

Although the Second Circuit has cautioned that hostile work environment claims present "mixed question[s] of law and fact" that are "especially well-suited for jury determination," Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 437 (2d Cir. 1999) (internal quotation marks and citation omitted); see also Holtz v. Rockefeller & Co., 258 F.3d 62, 75 (2d Cir. 2001) (describing question of hostile work environment as "one of fact"), "[t]here are, of course, cases in which it is clear to both the

trial court and the reviewing court that after assessing the
frequency of the misbehavior measured in light of its seriousness,
the facts cannot, as a matter of law, be the basis of a successful
hostile work environment claim," Schiano v. Quality Payroll Sys.,
Inc., 445 F.3d 597, 608 (2d Cir. 2006).

II. Hostile Work Environment Claims

        The anti-discrimination provision of Title VII forbids
employers from "discriminat[ing] against any individual with
respect to his compensation, terms, conditions, or privileges of
employment, because of such individual's . . . sex . . . ." 42
U.S.C. § 2000e-2(a)(1). Sexual harassment, a form of gender
discrimination, is proscribed by Title VII if it creates a "hostile
or abusive work environment." Meritor Sav. Bank, FSB v. Vinson,
477 U.S. 57, 66, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986). Under
the familiar burden-shifting framework established for Title VII
cases by the Supreme Court in McDonnell Douglas Corp. v. Green,
411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 668 (1973), the
burden lies initially with Mrs. Geller to make out a prima facie
case for her hostile work environment claim, see Carmody v. City
of N.Y., No. 05-CV-8084, 2006 WL 3317026, at *14 (S.D.N.Y. Nov.
13, 2006); Connolly v. TJX Cos., No. 07-CV-3282, 2010 WL 5491109,
at *5 (E.D.N.Y. Dec. 30, 2010).

16

To establish a prima facie case for hostile work environment under Title VII,[11] a plaintiff must show that the complained-of conduct (1) was objectively severe or pervasive, creating a work environment that a reasonable employee would find abusive or hostile, (2) roused in the plaintiff a subjective perception of hostility or abuse, and (3) was motivated by the plaintiff's sex. See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Here, Defendants argue that they are entitled to summary judgment on Mrs. Geller's hostile work environment claims because: (1) Defendant DiFilippi's conduct was not objectively severe or pervasive; (2) it was not unwelcomed by Mrs. Geller; and (3) the Ellerth-Faragher affirmative defense bars these claims.[12]

---

[11] The standards for evaluating hostile work environment claims under Title VII and the NYHRL are identical, see Schiano, 445 F.3d at 609; therefore, the Court will analyze these claims together.

However, individuals may not be held personally liable under Title VII, see Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000); therefore, to the extent that Plaintiffs seek to assert Title VII claims against Defendant DiFilippi, their claims are DISMISSED.

[12] Defendants also argue that the Court cannot consider any conduct that occurred prior to July 2009 in evaluating Plaintiffs' hostile work environment claims because Mrs. Geller was fully aware of North Shore's policies and reporting procedures and nonetheless failed to report any sexually offensive or discriminatory conduct to North Shore until the summer of 2009, months after the last alleged sexually discriminatory act occurred. The Court disagrees. So long as Mrs. Geller properly exhausted her administrative remedies, a fact which is not disputed, her failure to contemporaneously

Because the Court finds that the record is insufficient, as a matter of law, to permit a reasonable fact finder to conclude that Defendant DiFilippi's conduct was objectively severe and pervasive, it will not discuss Defendants' other grounds for summary judgment.

In general, to prevail on a hostile work environment claim, a plaintiff must establish that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal quotation marks omitted), superseded on other grounds by N.Y.C. LOCAL LAW No. 85; see also Harris, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview."). In determining whether a defendant's conduct is objectively severe and pervasive, the Court must consider the totality of the circumstances, which includes: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

_____

complain about the alleged conduct does not preclude her from raising a hostile work environment claim.

whether it unreasonably interferes with an employee's work performance." Desardouin v. City of Rochester, 708 F.3d 102, 105 (2d Cir. 2013) (quoting Harris, 510 U.S. at 23) (internal quotation marks omitted). Here, taking into consideration the totality of the circumstances viewed in the light most favorable to Mrs. Geller, the Court finds that her hostile work environment claims are insufficient to withstand summary judgment.

First, with regard to frequency, the record shows, at most, twenty or so remarks and one potentially inappropriate touching of her knee over a five year period. "The infrequency of the offensive comments is relevant to an assessment of their impact. A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995) (finding that nine comments made over a seven month period were too infrequent to be severe and pervasive). Courts in the Second Circuit have consistently found that "[i]solated, minor acts or occasional episodes do not warrant relief." Brennan v. Metro. Opera Assoc., Inc., 192 F.3d 310, 318 (2d Cir. 1999); see also Augustin v. Yale Club of N.Y.C., No. 03-CV-1924, 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (finding "infrequent and sporadic" remarks made over the course of five years, "insufficient, as a matter of law, for Plaintiff to maintain a hostile work environment claim"), aff'd, 274 F. App'x 76 (2d Cir.

2008); <u>Trinidad v. N.Y.C. Dep't of Corr.</u>, 423 F. Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of supervisors calling plaintiff a "bitch" and making sexual remarks over five years of employment insufficient to support a claim of discriminatory harassment).

<u>Second</u>, with respect to the severity of the conduct, the most "severe" instances in the present case are the allegations that Defendant DiFilippi smelled her perfume on a number of occasions, the variety of comments about her breasts, and his drawing of a penis on a whiteboard during a meeting. While these allegations undeniably evince inappropriate conduct on the part of a supervisor, whether viewed individually or in the aggregate, they are insufficient to meet the level of severity necessary to succeed on a hostile work environment claim. <u>Compare</u> <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998) (finding that a supervisor's comment that the plaintiff had the "sleekest ass" in the office and his deliberately touching the plaintiff's breasts with papers held in his hand, though "offensive and inappropriate, [were] sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [the plaintiff]'s work environment"), <u>abrogated in part on other grounds by</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), <u>and</u> <u>Vito v. Bausch & Lomb Inc.</u>, 403 F. App'x 593, 596-97 (2d Cir. 2010) (finding allegations

that a supervisor's "right hand slipped down . . . and touched her right breast" and made irritating and inappropriate comments, to fall short of the severity necessary to sustain a hostile work environment claim), and McKenna v. VCS Group L.L.C., No. 08-CV-1563, 2009 WL 3193879, at *5 (D. Conn. Sept. 30, 2009) (finding that the plaintiff failed to state a claim for a hostile work environment although on "not less than fifteen (15) occasions" over the course of her seven months of employment, a supervisor remarked upon the plaintiff's cleavage and "invited others at meetings to note that [the plaintiff] had 'large breasts'"),[13] with Redd v. N.Y. Div. of Parole, 678 F.3d 166, 178-79 (2d Cir. 2012) (finding that a supervisor touching an employee's breasts on three occasions presented a question of fact as to whether the abuse was sufficiently severe to create a hostile work environment, in part because the conduct could be physically threatening because the supervisor "repeatedly made physical contact with--and repeatedly felt--intimate parts of [the plaintiff]'s body").

---

[13] See also Alfano v. Costello, 294 F.3d 365, 379 (2d Cir. 2002) (finding that five incidents in a span of more than four years was insufficient to create a hostile work environment and collecting cases that have dismissed hostile work environment claims for insufficiency of evidence "even though, compared to what was adduced [t]here, they involved (1) a similar or greater number of incidents, (2) that were more compressed in time, and (3) that were more severe and had more pronounced discriminatory overtones").

In sum, while Defendant DiFilippi's conduct in the workplace was deplorable, the incidents alleged here "amount to little more than 'the sporadic use of abusive language, gender-related jokes, and occasional teasing' that fail to create a hostile environment." Vito, 403 F. App'x at 596 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)); see also Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment.").[14]  Accordingly, Defendants' motion for summary judgment on Mrs. Geller's Title VII and NYHRL hostile work environment claims is GRANTED, and these claims are hereby DISMISSED.

III. Retaliation

Mrs. Geller also asserts that the Defendants retaliated against her in violation of Title VII,[15] which prohibits an employer

---

[14] Further, given the evidentiary record here, including Mrs. Geller's testimony that, notwithstanding the alleged harassment, her relationship with DiFilippi was good through July 2009 (Mrs. Geller Dep. 348-49), the Court highly doubts that a reasonable jury would find that Mrs. Geller subjectively perceived DiFilippi's conduct to be hostile or abusive.  Nonetheless, as the Court has already determined that his conduct was not objectively severe and pervasive, it need not definitely decide this issue.

[15] Again, the standards for evaluating claims arising under Title VII and the NYHRL are identical for retaliation claims.  See Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 698 n.9 (2d Cir. 2012).  Thus, although the Court's analysis

from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are also analyzed under the McDonnell Douglas burden-shifting framework. See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010). The plaintiff bears the initial burden of establishing a prima facie case of retaliation. Once the plaintiff has satisfied the elements of his prima facie case, a presumption of retaliation is created and the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason for the adverse employment action." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citation omitted); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107 (2d Cir. 2011). Once such a reason has been presented, the presumption of retaliation dissipates and the employee must show that retaliation was the "but-for" cause of the challenged employment action. Univ.

---

focuses on Mrs. Geller's retaliation claims under Title VII, it is equally applicable to her claims under the NYHRL.

Further, as stated above, see supra note 10, as individuals cannot be held personally liable under Title VII, Mrs. Geller's Title VII retaliation claims against Defendant DiFilippi are hereby DISMISSED.

of Tex. Sw. Med. Ctr. v. Nassar, --- U.S. ----, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013).

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she was engaged in a protected activity under Title VII; (2) the defendant was aware of the plaintiff's participation in the protected activity; (3) the employer took an adverse action against the plaintiff based upon her activity; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer. Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003); Schiano, 445 F.3d at 608. Defendants argue that Mrs. Geller's retaliation claims fail because: (1) the only arguably protected activity was Mrs. Geller's meeting with Ms. Greene of Corporate Compliance on July 30, 2009; and (2) she did not suffer any adverse employment action subsequent to that report. The Court agrees.

A.  Protected Activity

Mrs. Geller asserts that the following all constitute protected activity: (1) her July 13, 2009 meeting with Ms. Oetting to complain about Defendant DiFilippi's aggressive behavior at the July 10 meeting; (2) her call to the Employee Assistance Program that same day; (3) her anonymous phone call to Corporate Compliance on July 23, 2009; and (4) the July 30, 2009 meeting with Ms. Greene. The Court finds that the first three complaints do not constitute protected activity under Title VII.

24

"[A] complaint is not protected activity unless it puts the employer on notice that the employee is protesting <u>unlawful</u> discrimination." <u>Tomasino v. St. John's Univ.</u>, No. 08-CV-2059, 2010 WL 3721047, at *10 (E.D.N.Y. Sept. 23, 2010) (emphasis added), <u>aff'd</u>, 476 F. App'x 923 (2d Cir. 2012); <u>see also</u> <u>Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons</u>, 842 F.2d 590, 594 (2d Cir. 1988) (holding that a complaint directed at conduct outside the definition of unlawful employment practice under Title VII cannot support a claim for retaliation). As one district court has observed, "[u]nfair treatment . . . is not actionable under the civil rights laws and a complaint about it does not constitute protected activity. To be actionable, the unfair treatment must be due to one's membership in a protected class and the complaint must make that point sufficiently clear." <u>Ramos v. City of N.Y.</u>, No. 96-CV-3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997).

Here, Plaintiffs assert that Mrs. Geller's analogizing DiFilippi's conduct to that of an abusive spouse was sufficient to put North Shore on notice that she was being subjected to unlawful discrimination based on her gender. The Court disagrees. <u>First</u>, Mrs. Geller testified that she did not believe that DiFilippi's outburst had anything to do with her gender. (Mrs. Geller Dep. 305.) Thus, as Mrs. Geller did not reasonably believe she was protesting unlawful discrimination, her claim necessarily fails. See <u>Kessler v. Westchester Cnty. Dep't of Soc. Servs.</u>, 461 F.3d

199, 210 (2d Cir. 2006) (stating that a plaintiff must "have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII" (quoting McMenemy v. City of Rochester, 241 F.3d 279, 285 (2d Cir. 2001) (internal quotation marks omitted)). Second, that Mrs. Geller complained that DiFilippi's anger reminded her of her "abusive" ex-husband does not save her claim. There is no evidence in the record that her ex-husband's anger was sexually motivated such that her complaint would have put North Shore on notice that she was complaining of sex-based discrimination. Thus, as Mrs. Geller, in complaining to Ms. Oetting, calling the Employee Assistance Program, and anonymously complaining to Corporate Compliance, did not say anything to suggest that DiFilippi's actions were sexually motivated, those complaints do not constitute protected activity under Title VII. See, e.g., Sank v. City Univ. of N.Y., No. 10-CV-4975, 2011 WL 5120668, at *10 (S.D.N.Y. Oct. 28, 2011) (finding that a letter that "complain[ed] about general perceived unfairness" toward the plaintiff was not protected activity because "it says nothing about any form of Title VII-prohibited discrimination"); Shan v. N.Y.C. Dep't of Health & Mental Hygiene, No. 05-CV-3245, 2007 WL 2746891, at *6 (S.D.N.Y. Sept. 19, 2007) (finding that a "lengthy e-mail . . . complaining about unfair treatment . . . and never once suggest[ing] that [the plaintiff's] treatment was caused by her race" was not protected activity),

aff'd, 316 F. App'x 23 (2d Cir. 2009). Therefore, the only protected activity for the purposes of this Memorandum and Order is Mrs. Geller's July 30, 2009 complaint to Ms. Greene, which, Mrs. Geller admits, is the first time that she complained of sexually inappropriate behavior.

B.    Adverse Employment Action

Based upon the above-finding, the Court will only look at alleged adverse employment actions that took place after the protected activity on July 30, 2009. See Pinero v. Long Island State Veterans Home, 375 F. Supp. 2d 162, 168 (E.D.N.Y. 2005) ("There can be no inference of retaliatory animus where the adverse employment action occurred prior to the protected activity." (citing Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001))).[16] Thus, the only possible adverse employment actions that are alleged to have occurred after Mrs. Geller's protected activity are: (1) she was required to do "grunt" work beginning in approximately August 2009 until her departure in February 2010; (2) she was purposely excluded from an email in December 2009; (3) her cubicle was moved sometime in the fall of 2009; and (4) her March 2010 resignation was the result of a constructive discharge.

---

[16] For this reason, the Court rejects Plaintiffs' assertion that her shift from part-time to full-time, Ms. Lembck and DiFilippi's alienating her, not being carbon copied on certain emails, being asked to document her hours spent on certain tasks, and being taken off the Taleo project constitute adverse employment actions, as they all pre-dated July 30, 2009.

An employment action is "materially adverse," and thus falling within the purview of Title VII, if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 555 (2d Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)) (internal quotation marks omitted). The Court finds that none of the above actions were materially adverse.

First, the move of her workspace and the allegations regarding her exclusion from emails are too minimal to be considered adverse employment actions. See, e.g., Roncallo v. Sikorsky Aircraft, 447 F. App'x 243, 245 (2d Cir. 2011) (finding that a temporary move from an office to a cubicle did not constitute a materially adverse employment action), cert. denied, 132 S. Ct. 1813 (2012); cf. Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 226 (2d Cir. 2006) (noting that alleged retaliatory acts must be "more than de minimis" to constitute adverse employment actions).

Second, with regard to what Mrs. Geller has characterized as grunt work, even if arguably an adverse employment action, see, e.g., Kessler, 461 F.3d at 209-10 (finding that a transfer to an office in which the employee "would not be allowed to perform the broad discretionary and managerial functions of [his] position, no one would report to him, and he would be forced

to do work normally performed by clerical and lower-level personnel" was sufficiently adverse to survive summary judgment), there is no causal connection between her complaint to Ms. Greene and being assigned menial tasks, as Mrs. Geller testified that she was given this work because she complained to Ms. Oetting (Mrs. Geller Dep. 183) thereby refuting any causal connection between her complaint to Ms. Greene and the alleged adverse employment action.

Finally, with respect to Mrs. Geller's alleged constructive discharge, the Supreme Court has held that a constructive discharge is "functionally the same as an actual termination" and therefore is considered an adverse employment action under Title VII. Pa. State Police v. Suders, 542 U.S. 129, 148, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004). To establish a constructive discharge, a plaintiff must show that the employer "intentionally create[d] a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003) (holding that allegations of constructive discharge, "viewed as a whole, [must be] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign" (internal quotation marks and citation omitted)). "[T]he standard is a demanding one," Miller v. Praxair, Inc., 408 F. App'x 408, 410 (2d Cir. 2010); "a constructive discharge cannot be proven merely by

evidence that an employee . . . preferred not to continue working for that employer" or that "the employee's working conditions were difficult or unpleasant," Spence v. Md. Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993). "Whether working conditions are sufficiently intolerable to constitute a constructive discharge 'is assessed objectively by reference to a reasonable person in the employee's position.'" Borski v. Staten Island Rapid Transit, 413 F. App'x 409, 411 (2d Cir. 2011) (quoting Petrosino, 385 F.3d at 230).

Here, Mrs. Geller claims that, in addition to Defendant DiFilippi's conduct, Ms. Lembck's reprimanding her on February 4, 2010, which compelled her to take a leave of absence and forced her to seek medical treatment for severe depression and anxiety, is sufficiently serious to establish a conditional discharge. The Court disagrees. Mrs. Geller testified that she resigned because she had gotten the job at CUNY, not because her work environment was intolerable. (Mrs. Geller Dep. 393 ("I wasn't constructively discharged. Q: You resigned? A: Yes. Q: And you resigned to take the new job at CUNY? A: Yes.").) Further, the Court has already found that DiFilippi's conduct was not severe and pervasive enough to support a claim for hostile work environment (which is a less demanding standard). See supra pp. 19-22. Finally, the incident with Ms. Lembck is nothing more than the sort of routine disagreements with supervisors or mild criticisms that are simply insufficient to establish the "intolerable" working conditions

necessary to support a constructive discharge claim. See, e.g.,
Pena v. Brattleboro Retreat, 702 F.2d 322, 325–26 (2d Cir. 1983)
(finding that disagreements with assigned duties and "business
judgments" of an employer "cannot even remotely be described as
intolerable").

While the Court is sympathetic that Mrs. Geller sought
the assistance of a mental health professional and received
medication for her anxiety and depression that was related to her
job, the inquiry is an objective one. See Jones v. SmithKline
Beecham Corp., 309 F. Supp. 2d 343, 353 (N.D.N.Y. 2004) (finding
that even though the plaintiff "may have suffered panic attacks
and anxiety, from an objective standpoint, there [wa]s
insufficient evidence in the record that [the p]laintiff's working
conditions were so intolerable such that an ordinary person would
feel compelled to resign"), aff'd, 157 F. App'x 348 (2d Cir. 2005).
And the Court does not find that objectively, even when viewing
the facts in a light most favorable to Mrs. Geller, that her
working conditions became so intolerable that a reasonable person
in her position would have felt compelled to resign.

Accordingly, the Court finds that there is insufficient
evidence in the record of an adverse employment action to warrant
a trial on Mrs. Geller's retaliation claims; thus, Defendants'
motion for summary judgment on these claims is GRANTED, and Mrs.
Geller's retaliation claims are DISMISSED.

IV.  Intentional and Negligent Infliction of Emotional Distress

Mrs. Geller also alleges that she was subjected to intentional and negligent infliction of emotional distress as a result of Defendants' alleged conduct.  The Court will address each claim separately.

A.  Intentional Infliction of Emotion Distress

"The state law tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress."  Bender v. City of N.Y., 78 F.3d 787, 790 (2d Cir. 1996) (citing Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993)).  Defendants argue that Plaintiff has failed to establish the first element.  The Court agrees.[17]

The standard for establishing an intentional infliction of emotional distress claim is "'rigorous, and difficult to satisfy.'"  Conboy v. AT&T Corp., 241 F.3d 242, 258 (2d Cir. 2001) (quoting Howell, 81 N.Y.2d at 122, 596 N.Y.S.2d at 353, 612 N.E.2d

_____

[17] Plaintiffs appear to argue that whether conduct is sufficiently extreme or outrageous is a question of fact for the jury.  However, the Second Circuit has explicitly held to the contrary, stating that "[w]hether the conduct alleged may reasonably be regarded as so extreme and outrageous to permit recovery is a matter for the court to determine in the first instance."  Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999).

at 702).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Howell, 81 N.Y.2d at 122, 596 N.Y.S.2d at 353, 612 N.E.2d at 702.  Further, where, as here, the plaintiff premises an intentional infliction of emotional distress claim on harassment or retaliation in the employment context, New York courts are particularly reluctant to find that such conduct is sufficiently extreme or outrageous to satisfy this demanding standard "absent a deliberate and malicious campaign against the plaintiff."  Fertig v. HRA Med. Assistance Program, No. 10-CV-8191, 2011 WL 1795235, at *6 (S.D.N.Y. May 6, 2011); see also Semper v. N.Y. Methodist Hosp., 786 F. Supp. 2d 566, 587 (E.D.N.Y. 2011) ("New York Courts are reluctant to allow [intentional infliction of emotional distress] claims in employment discrimination cases." (internal quotation marks and citation omitted)); Emmons v. City Univ. of N.Y., 715 F. Supp. 2d 394, 424 (E.D.N.Y. 2010) ("As a general proposition, adverse employment actions, even those based on discrimination, are not sufficient bases for intentional infliction claims.").

Thus, even accepting all of Mrs. Geller's allegations regarding DiFilippi's actions as true, the Court finds that the conduct alleged is insufficient to meet the threshold for extreme and outrageous conduct necessary to sustain a claim for intentional

33

inflication of emotional distress. See, e.g., Jaffe v. Nat'l League for Nursing, 222 A.D.2d 233, 233, 635 N.Y.S.2d 9, 9 (1st Dep't 1995) (finding that an employer's giving the plaintiff a "hard slap on [her] backside" was insufficient to establish intentional inflication of emotional distress); Foley v. Mobil Chem. Co., 214 A.D.2d 1003, 1004, 626 N.Y.S.2d 906, 908 (4th Dep't 1995) (finding "wholly inappropriate" sexual harassment did not establish a claim for intentional inflication of emotional distress). Thus, the Court GRANTS Defendants' summary judgment motion with regard to Mrs. Geller's intentional inflication of emotional distress claim, and this claim is hereby DISMISSED.

B.  Negligent Inflication of Emotional Distress

The Court finds that Mrs. Geller's negligent inflication of emotional distress claim fails for two reasons. First, "[u]nder New York law, a plaintiff may establish [a claim for negligent inflication of emotional distress] in one of two ways: (1) the 'bystander' theory; or (2) the 'direct duty theory.'" Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996). Here, Mrs. Geller is undoubtedly bringing her case under the "direct duty" theory, where a plaintiff suffers emotional distress caused by a "defendant's breach of a duty which unreasonably endangered [plaintiff's] own physical safety." Mortise, 102 F.3d at 696 (citing Kennedy v. McKesson Co., 58 N.Y.2d 500, 504, 462 N.Y.S.2d 421, 448 N.E.2d 1332 (1983)). Thus, to recover, there must be a

duty owed from Defendants to Mrs. Geller. "The duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." Mortise, 102 F.3d at 696. There are no facts in the record supporting the existence of such a duty here. See Alexander v. Westbury Union Free Sch. Dist., 829 F. Supp. 2d 89, 112 (E.D.N.Y. 2011) ("[A]n employer does not owe a special duty to an individual employee, because it has an obligation to treat all employees in the same manner.").

Second, because the Defendants are Mrs. Geller's employer, this claim, based on negligence, is barred by New York's Workers' Compensation Law. See Kruger v. EMFT, L.L.C., 87 A.D.3d 717, 719, 930 N.Y.S.2d 11, 14 (2d Dep't 2011); Dansler-Hill v. Rochester Inst. of Tech., 764 F. Supp. 2d 577, 585 (W.D.N.Y. 2011) (citing N.Y. WORKERS' COMP. LAW §§ 11, 29(6)). Mrs. Geller does not even attempt to make any arguments on her behalf with regard to this claim in her opposition to the motion for summary judgment and consequently appears to concede these points. Therefore, Defendants' motion for summary judgment on Mrs. Geller's claim for negligent infliction of emotional distress is GRANTED, and this claim is hereby DISMISSED.

V.    Loss of Consortium Claim

As a final matter, Mr. Geller has brought his own claim against the Defendants for loss of consortium. A claim for loss of consortium "is not an independent cause of action, but is

derivative in nature, and may only be maintained where permitted pursuant to the primary tort." Goldman v. MCL Cos. of Chi., Inc., 131 F. Supp. 2d 425, 427 (S.D.N.Y. 2000) (internal quotation marks and citation omitted). Actions for loss of consortium are not cognizable under federal civil rights statutes, see Murphy v. Cadillac Rubber & Plastics, Inc., 946 F. Supp. 1108, 1125 (W.D.N.Y. 1996), nor may they be brought pursuant to the NYHRL, see Moss v. Stinnes Corp., 169 F.3d 784, 785 (2d Cir. 1999). Plaintiffs do not appear to dispute this settled precedent. Therefore, the Court GRANTS Defendants' motion for summary judgment and DISMISSES Mr. Geller's claims for loss of consortium.

## CONCLUSION

For the foregoing reasons Defendants' motion for summary judgment is GRANTED in its entirety. The Clerk of the Court is directed to mark this matter CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     September   23  , 2013
           Central Islip, NY